SANTIAGO NOGUERAS ET AL., Plaintiffs and Appellees-Appellants, *v.* RAMONA MUÑOZ DE ALONSO, Defendant and Appellant-Appellee.

No. 9345. Argued May 5, 1947.—Decided June 12, 1947.

414

*Celestino Iriarte, F. Fernández Cuyar,* and *H. González Blanes* for the defendant and appellant-appellee. *José C. Jusino* for plaintifis and appellees-appellants.

MR. JUSTICE SNYDER delivered the opinion of the Court.

This is a suit for the nullity of a summary mortgage foreclosure proceeding and for the damages resulting therefrom. The defendant consented to a judgment of nullity.[1] Consequently, the only issue tried by the lower court was the amount of the damages. Both parties have appealed from portions of the judgment of the district court.

■ The delays encountered in disposing of this case are almost unbelievable. The mortgage was executed in 1920 to guarantee a loan of $4,500, interest at 9%, and $300 for costs and attorney's fees in the event of execution. The debtors ceased paying interest on March 7, 1923. The fore-

---

[1] The defendant conceded that the foreclosure proceeding was null because a private person rather than the marshal had made the demand for payment. *González* v. *Registrar,* 39 P.R.R. 753, decided a year before this nullity proceeding was filed.

closure proceeding was filed on August 29, 1924, and the farm was sold at public auction on May 15, 1925, to the defendant.

This nullity suit was filed in 1930. It was tried before Judge Torres Pérez on commission in 1931. He entered judgment in 1932, and appeal therefrom was dismissed by this Court in 1933. After various incidents not necessary to recite here, this judgment, by consent of the parties, was vacated in 1938 by Judge Samalea in view of *Annoni v. Blas Nadal's Heirs*, 94 F. (2d) 513 (C.C.A. 1, 1938).

A second trial was had before Judge Ponsa Parés in 1940, who died in 1942 without having decided the case. The case was submitted to Judge Belaval in 1943 on the transcript of testimony taken before Judge Ponsa, but he left the case undecided when he was appointed Judge of the District Court of San Juan in 1945. In 1946 the case was submitted to Judge Gallardo on the transcript of testimony taken before Judge Ponsa. As the case was decided by Judge Gallardo on a submitted record, we are not bound by his findings of fact, but are entitled to weigh the evidence independently. We turn first to the errors assigned by the defendant.

Since the defendant had sold the farm to a bona fide purchaser and therefore could not return it to the plaintiffs, the latter were entitled to the value thereof.[2] The plaintiffs argued that it was worth $12,000 in 1925 and 1926, whereas the defendant contend its value then was $3,000. The district court set this figure at $10,000. The first error assigned by the defendant is against this valuation by the lower court.

In reaching its conclusion as to the value of the farm, the district court said the following:

"The farm consists of 94.09 *cuerdas* and is located in 'Guadano' in Naranjito. It contains a dwelling and a wooden shed with a zinc

---

[2] We need not determine in this case whether the plaintiffs recover the value of the farm in 1925, when the plaintiffs lost it physically, or in 1926, when the defendant sold the farm to the bona fide purchaser. Cf. *Arvelo v. Banco Territorial & Agricola*, 29 P.R.R. 996. We need not determine this question, as we hold hereinafter that the value of the farm was the same in 1926 as in 1925.

roof. The testimony shows that the land is rolling but there are four *cuerdas* of flat land. Nevertheless, the farm is good, especially for the growing of tobacco. For the years 1925 and 1926 tobacco had a magnificent price, since it sold for $40 a *quintal*. The testimony is conflicting as to the value of the farm on the date it was sold at public auction by the Marshal of the District Court of San Juan. Doña Ramona Muñiz had it mortgaged for the principal sum of $4,500, plus an additional sum for costs and generally one who loans on mortgage must estimate that the farm is worth, at least, twice the amount loaned.''

Santiago Nogueras, one of the plaintiffs, who had many years of experience in the production and sale of tobacco, testified that this farm was excellent tobacco land; that it produced eight to ten *quintales* per *cuerda* of tobacco; that in 1926 tobacco sold at 42¢ a pound; that in 1926 the farm was worth $12,000; that after 1923 no tobacco was grown on the farm; that in 1924–25 no tobacco was planted to rest the land and instead tobacco was planted on the adjacent farm of the plaintiff's wife.

Florentino Longo, managing partner of the firm of Sucesores of Huertas & González, testified for the plaintiffs, as an expert in tobacco, that in 1925 tobacco sold at $30 and in 1926 it sold at $40 to $42 and this farm was therefore worth $10,000 to $12,000 during that period; that in 1921–22 his firm made an agricultural loan for the cultivation of tobacco on this farm, but not thereafter; that when the defendant took possession of the farm, there were a small house and a shed, both in bad condition, on the farm; that his firm acquired this farm in 1932 in payment of a debt of $4,500, and at that time it was worth $5,000 to $5,500; that at the date of trial, in 1940, it was worth $7,000; and that the farm consisted of 6 *cuerdas* of *vega* and 88 *cuerdas* of rolling land.

Ignacio Ramos testified for the plaintiffs, among other things, that the small house and shed were in bad condition and were worth $30 to $40 and $100, respectively.

Pilar Ortiz testified for the plaintiffs that he rents the property; that he has been paying $50 a month rent since

1935; that he has planted at different times 6 to 16 *cuerdas* of tobacco, which give him an average of 8 to 10 *quintales* per *cuerda;* that he also grows minor fruits and has some cattle grazing on this farm.

Manuel Alonso, son of the defendant, testified on her behalf, that he took possession of the farm for his mother in May, 1925; that it was abandoned at that time, with no house, shed, fences, or crops. He tried to sell it, but could not because it was in such bad condition. He therefore decided to improve it. He built fences, a shed and a house for the foreman, all of which cost $2,000. He planted six *cuerdas* of tobacco, which produced 4 to 5 *quintales* per *cuerda*. He lost money in the cultivation and finally on May 27, 1926 sold the farm to Benito Cabrera for $5,300.

José Llabona testified for the defendant that she offered to sell him the farm in 1925, and he went to see it. He found it was in bad condition and had no office or fences. He calculated at that time that the most he could offer for the farm was $4,000, and that at least $2,000 would have to be spent in offices, fences, etc. before work could be done there. He also testified that before 1925 he had been on the farm and had seen that the plaintiff was cultivating 15 to 20 *cuerdas* of tobacco.

Leopoldo Díaz testified for the defendant that he went to see the farm in 1925 because the defendant had offered to sell it to him. He did not like it because the land was hilly and without a shed or fences. It was not being cultivated and was in an abandoned state. He went there and tested the soil to see if it was good and he did not buy it because it was too hilly. Transportation to it was too costly because oxen and cars could not travel on it because it was hilly. In 1924–25 it was worth from $50 to $60 a *cuerda*.

Florentino Longo testified for the defendant that Huertas & González made an agricultural loan to the plaintiff from 1920 to 1922 but not thereafter. For 1920–21 they loaned

the plaintiff $4,307.78 on tobacco and possibly other items, and credited him with $3,796.88 for delivery of tobacco. He also testified that this agricultural loan included not only the farm in controversy but also the adjacent farm belonging to the wife of the plaintiff. The 1920–21 crop of 40 *cuerdas* was for both farms.

The documentary evidence showed that when Carmen Chinea took possession of this farm it was agreed that the house and shed were worth $110 and the farm $2,250. She sold the farm in 1920 for $7,500 to Félix Jiménez, who sold it the same year to the plaintiffs for $8,000. The defendant bought it at the foreclosure proceeding in 1925 and sold it in 1926 to Benito Cabrera for $5,300. In 1932 Benito Cabrera sold it to Santiago Cabrera for $4,500, but this sale was annulled in 1933. In 1925 Benito Cabrera conveyed the farm to Sucesores Huertas & González in payment of a debt for $4,500. Huertas & González issued some bearer notes in 1938, guaranteed in part by this property, which would respond therefor in the amount of $5,500. From 1922 to 1925 the farm was assessed for taxes at $6,000, and for 1925–26, at $5,970.

After examining all the testimony, we are unable to agree with the district court that the farm was worth $10,000 in 1925 or 1926. The lower court stated that "generally one who loans on mortgage must estimate that the farm is worth, at least, twice the amount loaned." The first defect in this reasoning is that the money was loaned in 1920 and we are endeavouring to determine the market value of the farm in 1925 or 1926. Apart from that point, the rule announced by the district court may or may not be a wise investment policy. But it certainly is not a rule of thumb by which the courts automatically and mechanically determine the value of property in cases of this type.

"In spite of the severity with which the code penalizes the possession in bad faith, we do not believe that such rigor

should be carried to the point of permitting the owner to enrich himself at the expense of the possessor." *Román Benítez* v. *Rivera,* 43 P.R.R. 512, 527. And in the absence of evidence to the contrary, we assume that the defendant was endeavouring to sell the property at the highest price he could obtain. We therefore agree with the defendant that the best evidence of its market value at the time of the public sale in 1925 and in 1926 under all the circumstances of this case was the sales price of $5,300 which the defendant received therefor in 1926. *Arvelo* v. *Banco Territorial & Agrícola,* 29 P.R.R. 996, 1004, 1005; *Pontón* v. *Sucrs. of Huertas González,* 46 P.R.R. 763, 769–70; *Santana* v. *Orcasitas,* 47 P.R.R. 695, 708. If anything, this conclusion is favorable to the plaintiff in view of the testimony that the defendant made certain improvements on the farm before selling it. And we find it significant that Judge Torres Pérez came to exactly the same conclusion, although on a different record, in 1932, when it was easier than at this late date to determine the market value of the farm as of 1925 or 1926. We therefore hold that in 1925 and in 1926 the market value of the farm was not $10,000 as the district court found but $5,300.

■ The defendant assigns as the second error the holding of the district court awarding the plaintiffs $5,000 as fruits produced by the farm. The lower court found that the fruits were $1,000 anually, and held that the plaintiffs were entitled to collect this sum for the five years from the date the defendant went into possession in 1926 until the date the complaint in this nullity suit was filed in 1930.

The plaintiffs do not contend here that they are entitled to recover fruits from the defendant for five years. They confine their claim to the period from May, 1925, when the defendant went into possession until May, 1926, when she sold the farm. They assert that the testimony shows that the farm should have produced $4,100 in net profits from

tobacco during that period, and an unspecified additional sum for the grazing of cattle and minor fruits.

We see no purpose in setting forth in detail the testimony on this point. The evidence does not convince us that this farm was or could have been operated at a profit during that year. We therefore find no basis for the $5,000 award of profits by the lower court. *Arvelo et al* v. *Banco Territorial & Agrícola, supra,* p. 1005; *Pontón* v. *Sucesores of Huertas, supra,* p. 771. In coming to this conclusion, we have not been unmindful of the fact that the plaintiffs failed to pay interest for a considerable period before and after the foreclosure proceeding was instituted and apparently abandoned the property precisely because they were unable to operate it at a profit.

 The defendant assigns as the third error the holding of the lower court that the defendant was entitled by way of counterclaim to collect interest at 9% on the mortgage loan of $4,500 only (*a*) from 1923 until August, 1924, and (*b*) from 1925, when the defendant filed the foreclosure proceeding, until this nullity suit was filed in 1930.

The mortgage deed provides for 9% interest. No interest was paid after March 9, 1923. We therefore agree with the contention of the defendant that she is entitled to 9% interest on $4,500 from March 9, 1923 until the date of our judgment.[3] We recognize that this represents a minor modification of the result we reached in *F. Rodríguez Hermanos & Co.* v. *Aboy,* 66 P.R.R. 498.

 In her fourth and last assignment of error the defendant complains of the failure of the district court to grant her counterclaim for (1) the taxes on the farm paid by the defendant while she was in possession and (2) the value of the improvements made on the farm by the defendant.

---

Interest runs until our judgment rather than the judgment of the district court in view of the fact that hereinafter we reverse the judgment of the district court, leaving ours as the only judgment in the case.

The defendant's son testified without contradiction that the defendant paid $161.43 for such taxes while she was in possession. The only objection now made by the plaintiffs is that some of the receipts were issued in the name of one of the plaintiffs, and that the presumption therefore is that the plaintiffs paid the taxes for which these receipts were issued. But even if we concede that such a presumption exists, it was rebutted by the testimony offered by the defendant.

■ As to the alleged improvements made by the defendant, she is entitled under § 384 of the Civil Code "to be reimbursed for the necessary expenses incurred in the preservation" of the farm. See *Román Benítez* v. *Rivera, supra,* p. 522; *Costa* v. *Piazza,* 51 P.R.R. 667; *Concepción* v. *Latoni,* 51 P.R.R. 547, 563–4; *Cabrera* v. *Morales,* 57 P.R.R. 445, 451; *Concepción* v. *Latoni,* 62 P.R.R. 98. But the defendant has the burden of proof to show clearly and in detail exactly how the money was spent and why it was necessary or desirable to do so. Her claim here is for $2,000 to $2,300 for putting in fences and constructing a shed and a small house. In view of the general nature of the testimony and the conflict in the evidence as to some of the items, we are of the view, under all the circumstances of the case, that this portion of the counterclaim should be disallowed.

■ Turning to the appeal of the plaintiffs, the first error they assign is the failure of the district court to grant interest on the value of the farm from May 27, 1926, the date on which the defendant sold the farm to a third person, until the present. As we have seen, the defendant was required to pay to the plaintiffs the fruits of the farm, if there had been any, while the defendant was in possession from 1925 to 1926. And once the defendant sold the farm to a bona fide purchaser in 1926, the defendant was required to pay interest from that date on its value until the latter was recovered by the plaintiffs. This is because the defendant has the use

of that money during that period. See *F. Rodríguez Hermanos & Co.* v. *Aboy, supra.* The defendant will therefore be required to pay interest at the legal rate of 6% on $5,300 from May 27, 1926, until the date of our judgment.

In their second assignment of error the plaintiffs contend that they were entitled to $4,100 as fruits from May, 1925, to May 27, 1926, the period during which the defendant was in possession of the farm. We have already disposed of this question in our discussion of the defendant's second assignment of error.

In their third assignment the plaintiffs contend that the lower court was not warranted in providing that they must pay the $487.76 interest due when the foreclosure proceeding was instituted. Their argument is that the admission of the defendant that the foreclosure proceeding was null prevents collections of this interest, in view of the fact that one of the allegations of their answer in the nullity proceeding was that the interest had been paid until February, 1924. But the consent of the defendant to a judgment of nullity was predicated solely on the improper demand for payment. And the plaintiffs presented no testimony to contradict the evidence offered by the defendant that interest had not been paid after March 7, 1923. The error assigned was therefore not committed.

The fourth assignment of error, relating to the provision of the judgment of the lower court that the plaintiffs must pay the defendant interest from May 27, 1926 to August 30, 1930, is covered by the discussion of the third assignment of error by the defendant.

The fifth error assigned by the plaintiffs is directed against the refusal of the lower court to award costs and attorney's fees to the plaintiffs. We see no reason to disturb the judgment in this respect.

The judgment of the district court provided for $10,000 for the plaintiffs for the value of the farm in 1925 and

$5,000 for fruits for the plaintiffs from 1926 to 1930. The lower court subtracted from this $15,000 the sum of $6,712.01 —the principal amount of the mortgage loan of $4,500 plus interest as awarded by the district court—and rendered judgment for the plaintiffs for $8,287.99.

The judgment of the district court will be reversed and a new judgment will be entered in favor of the defendant for $2,497.06. We arrive at this figure by virtue of the fact that the plaintiffs are entitled to (1) $5,300, the value of the farm in 1925 and in 1926, and (2) $6,691.25, which is the interest on $5,300 at the legal rate of 6% interest from May 27, 1926, when the plaintiffs lost the farm, until the date of our judgment. These two figures total $11,991.25. On the other hand, the defendant is entitled to (1) $4,500, the amount of the mortgage loan, (2) $161.43, paid by the defendant in taxes on the property, and (3) $9,826.88, which is the interest on $4,500 at 9% from March 7, 1923, the date the plaintiffs ceased paying interest on the mortgage loan, until the date of our judgment. These three figures total $14,488.31. The counterclaim of the defendant therefore exceeds the claim of the plaintiffs by $2,497.06.